# IN THE SUPREME COURT OF TEXAS

══════════
No. 17-0332
══════════

BARROW-SHAVER RESOURCES COMPANY, PETITIONER,

v.

CARRIZO OIL & GAS, INC., RESPONDENT

══════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS
══════════════════════════════════════════

**Argued December 4, 2018**

JUSTICE GREEN delivered the opinion of the Court, in which JUSTICE LEHRMANN, JUSTICE DEVINE, JUSTICE BLACKLOCK, and JUSTICE BROWN joined.

JUSTICE GUZMAN filed a concurring and dissenting opinion, in which CHIEF JUSTICE HECHT and JUSTICE BUSBY joined.

JUSTICE BOYD filed a dissenting opinion.

In this case, we must determine whether the court of appeals erred in: (1) holding that the plaintiff could not prevail on its breach of contract claim as a matter of law because the contract's consent-to-assignment provision unambiguously gave the defendant an unqualified right to refuse to consent; and (2) holding that the plaintiff cannot prevail on its fraud claim as a matter of law because it could not justifiably rely on an oral promise to do something that was addressed in the written contract. We hold that: (1) the plain language of the contract unambiguously entitled the defendant to withhold its consent to a proposed assignment, and therefore the defendant could not

have breached the contract as a matter of law; and (2) the plaintiff could not justifiably rely on an oral statement where the written terms of the contract controlled. Accordingly, we affirm the judgment of the court of appeals.

## I. Background

Barrow-Shaver Resources Co., formed in 1989, is an oil and gas exploration and drilling company. Scott Shaver, a co-owner of Barrow-Shaver, has been involved in developing, buying, and selling oil and gas prospects for thirty years. Barrow-Shaver operates approximately a hundred oil and gas wells and often sells its oil and gas interests to third parties. Chip Johnson founded Carrizo Oil & Gas, Inc. in 1993 as its president and chief executive officer. Carrizo became a publicly traded oil and gas company in 1997 and now has 248 employees.

Barrow-Shaver was prospecting in four counties in North-central Texas to put together one large drilling prospect. Carrizo had an interest as a lessee in the 22,000-acre Parkey lease, which was set to expire on April 23, 2011, if a producing well was not established in accordance with the lease agreement. Carrizo entered into a farmout agreement with Barrow-Shaver, in which Barrow-Shaver would earn a partial assignment of Carrizo's interest in the Parkey lease in exchange for its services in drilling a producing well. To memorialize this farmout, Carrizo and Barrow-Shaver executed a letter agreement in March 2011. Stewart Laufer, Carrizo's Southern United States Land Manager, and Harold Bertram, Barrow-Shaver's Vice President of Land and Marketing, negotiated the farmout. Both representatives had extensive experience in the oil and gas industry—Laufer had twenty-five years of experience, while Bertram had thirty-three. As negotiations ensued, the parties focused on the consent-to-assign provision, addressing Barrow-Shaver's ability to assign its rights

2

in the future. Bertram submitted the first proposal for the letter agreement, which did not address consent to assign. Laufer then sent a revised draft containing a consent-to-assign provision that provided:

> The rights provided to [Barrow-Shaver] under this Letter Agreement may not be assigned, subleased or otherwise transferred in whole or in part, without the express written consent of Carrizo which consent shall not be unreasonably withheld.

Laufer later revised the draft, deleting the "shall not be unreasonably withheld" language. Barrow-Shaver fervently objected to the deletion of this language, insisting that Barrow-Shaver now wanted a consent-to-assign provision providing that Carrizo could not unreasonably withhold its consent. But Laufer assured Barrow-Shaver, on more than one occasion, that Carrizo would provide its consent to assign. Bertram specifically recalled three instances in which Laufer represented to him that Carrizo would give Barrow-Shaver consent to assign if Barrow-Shaver chose to assign its rights in the future. In executing the farmout, the parties ultimately agreed to a consent-to-assign provision stating:

> The rights provided to [Barrow-Shaver] under this Letter Agreement may not be assigned, subleased or otherwise transferred in whole or in part, without the express written consent of Carrizo.

After entering into the farmout, Carrizo's interest in the 22,000 acres was an overriding royalty interest and a future interest (a possibility of reverter) in the tract if Barrow-Shaver failed to drill a producing well in accordance with the farmout. If Barrow-Shaver's interest reverted back to Carrizo, it would require Carrizo to drill a well according to the terms of the Parkey lease or extend the lease; otherwise, its interest in the Parkey lease would terminate. Shortly after entering

3

into the farmout, and before the Parkey lease expired, Barrow-Shaver drilled a well. Barrow-Shaver spent $22 million drilling the well yet had unsuccessful results.

Raptor Petroleum II, LLC approached Barrow-Shaver about assignment of the farmout and offered approximately $27 million for Barrow-Shaver to assign its rights. Carrizo would retain its interest provided for in the farmout under this proposed assignment. To assign its rights under the farmout, Barrow-Shaver would have to obtain Carrizo's consent, as well as the consent of other interest holders. All parties consented, except Carrizo. Instead, Carrizo proposed selling its interest in the Parkey lease to Barrow-Shaver for $5 million. Barrow-Shaver did not respond to that offer, in effect rejecting it. Carrizo ultimately refused to consent to Barrow-Shaver's proposed assignment to Raptor. As a result, Raptor's offer to purchase an assignment of the farmout from Barrow-Shaver fell through.

Barrow-Shaver sued Carrizo for breach of contract, fraud, and tortious interference with contract.[1] Carrizo asserted at trial that the farmout letter agreement is clear and unambiguous. In fact, both parties agreed that the consent-to-assign provision is unambiguous. Carrizo also argued that the prior drafts of the agreement should be admitted to inform the jury of the surrounding circumstances of the consent-to-assign provision. The trial court did not allow the jury to hear evidence of Barrow-Shaver's and Carrizo's negotiations of the farmout agreement. However, the jury did hear that there were prior drafts of the agreement that had different consent provisions. The court instructed the jury: "[T]he court and only the court may interpret the farmout agreement. Any evidence of prior drafts or versions of the farmout may not be used by you as to what the farmout

---

[1] The tortious interference with contract claim is not at issue in this Court.

4

means. These may be used only to impeach the believability of a witness that testifies in regards to those."[2]

Barrow-Shaver asserted that although the consent-to-assign provision was unambiguous, it was silent as to the basis on which Carrizo could withhold its consent. Barrow-Shaver, therefore, argued that the jury must hear evidence of industry custom and usage to determine whether Carrizo breached the contract. Carrizo disagreed, contending that the consent-to-assign provision is not silent, rather it clearly imposes a hard consent obligation on Barrow-Shaver such that Carrizo could withhold its consent for any reason. The trial court allowed testimony as to industry custom and usage in relation to the breach of contract claim. Professor Bruce Kramer provided expert testimony as to industry custom and usage on behalf of Barrow-Shaver, and K. Ray Campbell provided the expert testimony for Carrizo. Professor Kramer told the jury that although the farmout agreement was unambiguous, industry custom played a role in understanding the circumstances under which Carrizo could have withheld its consent under the consent-to-assign provision. Kramer stated that, in his opinion, charging for consent to assign is inconsistent with the custom and usage of the industry—opining that refusing consent based on something which is outside the industry custom and usage constituted a breach of the farmout agreement. Campbell testified that, in his opinion, it is not industry custom for a consent-to-assign provision in a farmout agreement to set out the conditions for when a party may or may not consent. In fact, Campbell stated that the consent-to-

---

[2] The trial court had granted a motion in limine to keep the jury from hearing any evidence of the parties' negotiations of the consent-to-assign provision; however, when the parties' prior agreements were accidentally admitted into evidence due to a clerical error, the trial court allowed the parties to agree to a curative jury instruction to avoid a mistrial. The jury was only shown the prior drafts with differing consent-to-assign provisions and did not hear testimony about the underlying negotiations.

assign provision at issue is the most common found in farmout agreements, and it affords the farmor discretion to provide or withhold consent under any circumstances.

The trial court, finding the farmout agreement unambiguous, interpreted the agreement as a matter of law. According to the jury charge, the trial court found the farmout agreement silent as to the reasons under which Carrizo could refuse consent to Barrow-Shaver's assignment of the farmout. Therefore, the trial court submitted the breach of contract question to the jury, explaining that it may consider evidence of industry custom in deciding whether Carrizo breached the agreement.[3] The jury reached a unanimous verdict in favor of Barrow-Shaver on all three of its claims, awarding $27,690,466.86 in total damages, in addition to pre-judgment interest and attorneys' fees.

The court of appeals reversed the trial court's judgment. 516 S.W.3d 89, 92 (Tex. App.—Tyler 2017, pet. granted). In addressing the breach of contract issue, the court of appeals agreed with Carrizo that the evidence of the prior drafts of the farmout agreement and the parties' negotiations conclusively established that Carrizo could withhold its consent to assign for any reason or no reason—that is, that the purposeful deletion of the qualifying language "which consent shall

---

[3] Question one of the jury charge provided:

Did Carrizo fail to comply with the Farmout Agreement?

You are instructed that the Farmout Agreement is silent about the reasons under which Carrizo could refuse consent to [Barrow-Shaver]'s assignment of the Farmout Agreement to Raptor. Therefore, you may consider evidence of industry custom and expectations in deciding whether Carrizo breached its agreement with [Barrow-Shaver]. [Barrow-Shaver] contends that there was a custom and usage in the oil and gas industry that a consent to assignment not be unreasonably withheld. Custom and usage refers to a practice that is so general and universal that the parties are charged with knowledge of its existence to such an extent as to raise a presumption that they dealt with reference to it.

The jury answered: "Yes."

6

not be unreasonably withheld" showed that Carrizo bargained for hard consent. *Id.* at 96. Reasoning that "[n]egotiations of a contract can matter in determining whether it is silent on a material term," the court of appeals concluded that the trial court abused its discretion in refusing to admit evidence of the parties' negotiations. *Id.* (citation omitted). The court used the parties' negotiations as surrounding circumstances and held that the contract was not silent as to when consent could be withheld. *Id.* at 97. The court then held that because the provision was unambiguous, it should have been construed as a matter of law and therefore the breach of contract issue should not have been submitted to the jury. *Id.* As to the fraud issue, the court of appeals explained that "[a] written contract vitiates any reliance on oral promises" and therefore held that no evidence supported the justifiable reliance element of Barrow-Shaver's fraud claim. *Id.* at 98 (citation omitted). Lastly, because the court of appeals construed the consent-to-assign provision to permit Carrizo to withhold consent for any reason, it held that there could be no claim for tortious inference with contract. *Id.*

## II. Breach of Contract

We first consider whether the court of appeals erred in construing the farmout agreement's consent-to-assign provision to "mean that [Carrizo] had an unqualified right to refuse consent for Barrow-Shaver to assign the farmout to Raptor." *Id.* at 94. Barrow-Shaver contends that the consent-to-assign provision must be construed to mean that consent cannot be unreasonably or arbitrarily withheld, arguing that Carrizo's refusal to consent was for an "illegitimate" reason and

7

is inconsistent with industry custom.[4] Barrow-Shaver essentially takes the position that it should be able to benefit from its desired assignment despite the consent-to-assign provision's clear language preventing it from assigning its rights without Carrizo's "express written consent."

This case involves two sophisticated, experienced energy companies who negotiated a farmout agreement, which is a contract between a working-interest owner (the farmor) and the drilling operator (the farmee) that has no interest in the minerals until it completes its services under the farmout. *See Farmout Agreement*, WILLIAMS & MEYERS MANUAL OF OIL AND GAS TERMS (16th ed. 2015). A farmout agreement is

> [a] very common form of agreement between operators, whereby a lease owner not desirous of drilling at the time agrees to assign the lease, or some portion of it . . . to another operator who is desirous of drilling the tract . . . . The primary characteristic of the farmout is the obligation of the assignee to drill one or more wells on the assigned acreage as a prerequisite to completion of the transfer to him.

*Id.* The parties specifically characterized their farmout as a drill-to-earn farmout.[5]

---

[4] We note at the outset that Carrizo disputes Barrow-Shaver's characterization of Carrizo's denial of consent as presenting a cash-for-consent demand bordering on extortion. Barrow-Shaver's counsel began oral argument by articulating the issue as whether, when an "oil and gas contract gives you a right to consent to assignment of the lease, can you demand cash for the consent." And then he claimed that Carrizo "blew up the deal" with Raptor "by saying, 'we will consent only if you pay us $5 million.'" In reality, Carrizo says, it offered to sell its interest under the lease to Barrow-Shaver for $5 million, which it considered a fair price, thereby seeking to transfer all of its future rights in the Parkey lease (or its farmout) in exchange for the $5 million. Although that would have eliminated the need for Carrizo to consent, allowing Barrow-Shaver to freely assign its rights to Raptor for $27 million, Barrow-Shaver did not respond to the offer, in effect refusing it. Ultimately, Carrizo did not consent to Barrow-Shaver's assignment to Raptor, but it offered no reason for its refusal.

[5] Kramer testified that:

A lease presently transfers the right to develop and possess to the lessee. A farmout, and the kind of farmout that they're doing here, normally will require the farmee—in this case, Barrow-Shaver Resources—to do something which would, in this case, be [to] explore for and produce hydrocarbons, at which time . . . they will be transferred the legal ownership of the minerals.

## A. Contract Construction

In contract construction cases, we are tasked with finding the meaning of a provision to which the parties have agreed. *See, e.g.*, *Murphy Expl. & Prod. Co.–USA v. Adams*, 560 S.W.3d 105, 110 (Tex. 2018) (interpreting the contract to ascertain its meaning before determining whether the party breached the contract); *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981) (explaining that we are to settle the meaning of the contract when there is a question relating to its construction (citation omitted)). Both Barrow-Shaver's claims of breach of contract and fraud turn on the meaning of the consent-to-assign provision. Therefore, before determining whether the court of appeals erred in holding that Barrow-Shaver cannot prevail as a matter of law on either its contract or its fraud claim, we must ascertain the meaning of the farmout agreement's consent-to-assign provision.

In construing a contract, we must look to the language of the parties' agreement. *See, e.g.*, *Murphy Expl.*, 560 S.W.3d at 108 (explaining that in construing an oil and gas contract, we "ascertain the true intentions of the parties as expressed in the writing," beginning with the contract's express language (citation omitted)). We construe contracts under a de novo standard of review. *See, e.g.*, *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) (citations omitted). We must give effect to the parties' intentions, as expressed in their agreement. *See, e.g.*, *Murphy Expl.*, 560 S.W.3d at 108 (citation omitted). We will give a contract language its plain, grammatical meaning unless it "would clearly defeat the parties' intentions." *See, e.g.*, *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002) (citation omitted).

9

"If we determine that the contract's language can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous and we will construe it as a matter of law." *El Paso Field Servs., L.P. v. Mastec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012) (citation omitted). But if the contract contains two or more reasonable interpretations, the contract is ambiguous, creating a fact issue as to the parties' intent. *See id.* (citation omitted).

The parties here both contend that the farmout agreement is unambiguous, and the trial court and court of appeals agreed. *See* 516 S.W.3d at 94, 96–97. *But see URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018) (explaining that a contract "may be ambiguous even though the parties agree it is not" (citations omitted)). When a court determines that a contract is ambiguous, the meaning becomes a fact issue for the jury and extraneous evidence may be admitted to help determine the language's meaning. *Italian Cowboy Partners, Ltd. v. Prudential Ins. of Am.*, 341 S.W.3d 323, 333–34 (Tex. 2011) (citation omitted). But a trial court errs when it submits an unambiguous contract to the jury rather than construing it as a matter of law. *See Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (per curiam) (citation omitted). The error is harmless, however, if the jury found as the trial court should have found. *See id.* (citing TEX. R. APP. P. 44.1(a)(1); *Spencer v. Eagle Star Ins. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994)). "Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise." *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005)).

The parties agree the farmout agreement, which provides that "[t]he rights provided to Barrow-Shaver under this Letter Agreement may not be assigned, subleased or otherwise transferred in whole or in part, without the express written consent of Carrizo," does not define consent. And they agree that the agreement gives Carrizo a right to withhold consent to a proposed assignment.[6] The question before us is whether, as the court of appeals held, Carrizo's right to refuse consent to an assignment is unqualified, or whether, as Barrow-Shaver contends, that right is qualified by a reasonableness standard.

We begin with Barrow-Shaver's contention that the agreement's use of the term "consent" qualifies Carrizo's right to withhold consent to an assignment. Nothing in the agreement suggests that the parties intended to use the term in a technical sense; rather, the term can easily be understood according to its plain, ordinary, and generally accepted meaning—approval. *See Murphy Expl.*, 560 S.W.3d at 108; *see also Consent*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (defining it as "to express a willingness," "give assent or approval," "compliance or approval . . . of what is done or proposed by another," or "capable, deliberate, and voluntary agreement to or concurrence in some act or purpose implying physical and mental power and free action"); *Consent*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A voluntary yielding to what another proposes or desires."). Indeed, Barrow-Shaver has never argued that under some definition of "consent," Carrizo

---

[6] Barrow-Shaver does not use the word "right" in describing Carrizo's authority under the farmout agreement. However, Barrow-Shaver acknowledges that Carrizo could withhold consent without breaching the contract. Barrow-Shaver simply takes the position that Carrizo's right to withhold consent is restricted, or qualified as we refer to it here, by a reasonableness standard.

actually consented. Thus, our analysis here does not turn on what "consent" is, but on what the farmout agreement requires as to the giving or withholding of consent.

The farmout agreement indicates that the parties agreed to *how* consent must be given: consent must be express, and it must be in writing. The contract contains no other consent requirements—it does not impose a deadline for consent to be given, it does not require that it be notarized or signed by a particular individual, nor does it prescribe a specific format for the consent, except that it be written and express. To the extent that the farmout agreement does not reflect any additional requirements as to Carrizo's consent, the absence of such language indicates there are no other qualifiers, and "[l]ack of clarity does not create an ambiguity." *See Universal Health Servs. Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003) (citation omitted). We agree with the parties and the courts below that the express language of the agreement here is unambiguous.

The consent-to-assign provision plainly states that Barrow-Shaver cannot assign its rights unless it obtains Carrizo's consent, which must be express and in writing. In other words, Carrizo has a right to consent to a proposed assignment, or not. The plain language of the provision imposes no obligation on Carrizo—it does not require Carrizo to consent when certain conditions are satisfied, require Carrizo to provide a reason for withholding consent, or subject Carrizo to any particular standard for withholding consent. The crux of this contract construction issue is whether the agreement's silence as to refusal or withholding of consent should nevertheless be interpreted to qualify Carrizo's right to withhold consent to an assignment of Barrow-Shaver's rights as farmee.

12

Silence as to a material term differs from silence as to an immaterial or non-essential term. *See generally Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 240 (Tex. 2016) (holding that a contract clause was enforceable because it was "sufficiently definite to enable a court to determine [the party's] obligations and to provide a remedy for its breach"). In *Fischer v. CTMI*, we explained that "a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness'" to be enforceable. *Id.* at 237 (citation omitted). An agreement's terms must be "sufficiently definite to enable a court to understand the parties' obligations." *Id.* (citation & internal quotations omitted). But we explained that the terms need be definite and certain only as to the terms that are "material and essential" to the agreement. *See id.* (citations omitted); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("The material terms of the contract must be agreed upon before a court can enforce the contract."). Material and essential terms are those that the parties would consider "vitally important ingredients" to their agreement and are determined on a case-by-case basis. *See Fischer*, 479 S.W.3d at 237 (citations & alteration omitted). A material term that appears to be indefinite or uncertain may be supplemented or given further precision. *See id.* at 239–40 (citation omitted). Because only material and essential terms need be sufficiently definite and certain, and we refrain from rewriting or adding to parties' contracts, it follows that a term that is immaterial or non-essential may not be supplemented or given further precision. *See id.*

We next consider the parties' farmout agreement to determine whether additional terms—especially those as to withholding consent—are material and essential, or whether the agreement's terms are sufficiently definite to understand the parties' obligations. *See id.* at 237; *T.O.*

13

*Stanley Boot Co.*, 847 S.W.2d at 221 ("Each contract should be considered separately to determine its material terms." (citation omitted)). In considering what terms are material, we must be mindful of the nature of the contract. For example, in a contract to loan money, the amount to be loaned, the loan's maturity date, its interest rate, and its repayment terms are generally considered the material terms. *See T.O. Stanley Boot Co*, 847 S.W.2d at 221 (citations omitted). In a farmout situation, we observe that the farmee is obligated to drill on the land, and no mineral interest transfers to the farmee until it satisfies its drilling obligation under the farmout agreement. *See Farmout Agreement*, WILLIAMS & MEYERS MANUAL OF OIL AND GAS TERMS (16th ed. 2015). Because the primary purpose of a farmout agreement is the farmee's obligation to drill on the land to complete the transfer of an interest, a consent-to-assign provision is not material to the farmout. Here, the farmout agreement specifies, among other terms, the manner in which Barrow-Shaver must drill the well in order to earn an interest under the agreement, what Barrow-Shaver will earn upon successful completion of a well, and what happens in the event that Barrow-Shaver fails to complete the well timely. These terms establish the essential obligations of the parties and remedies for when the obligations are breached. *See generally Fischer*, 479 S.W.3d at 237, 240. Thus, the farmout agreement contains all the terms necessary for the contract's enforcement even without the consent-to-assign provision. *See McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (per curiam) (explaining that a contract containing all the terms necessary to make the contract binding and enforceable contains all material terms).

Likewise, within a consent-to-assign provision, additional terms are not material when the agreement is sufficiently definite to understand the parties' obligations. *See Fischer*, 479 S.W.3d

at 237, 240. For example, the consent-to-assign provision here contains no terms as to whether the written consent must be notarized, signed in blue ink, provided within a certain time after a request, or given by Carrizo's president. Such terms are not material to the parties' obligations under the agreement, as the parties can understand, comply with, and enforce their obligations under the consent provision without implying any such terms. And when, as here, a consent provision can be enforced on the basis of the contract's terms relating to *giving* consent, additional terms relating to *withholding* consent are not material or essential to the contract. In this consent-to-assign provision, "consent" and "may not be assigned without express written consent" are sufficiently definite to determine Barrow-Shaver's and Carrizo's rights and obligations as to assignment under the farmout agreement. *See generally id.* The farmout agreement makes clear that Barrow-Shaver has the right to assign its rights under the farmout agreement, but Barrow-Shaver must first satisfy its obligation to obtain Carrizo's express and written consent; Carrizo has no obligation. Where the obligations are clear and enforceable based on the agreement's terms, we will not imply a term relating to the withholding of consent. *See generally Centex Homes v. Buecher*, 95 S.W.3d 266, 273 (Tex. 2002) (providing that courts will only imply a warranty of good workmanship as a "gap-filler" or "default warranty" if the parties have not expressed a contrary intention (citation omitted)). We hold that terms relating to the withholding of consent are immaterial to the farmout agreement, and the agreement's purported silence as to when consent may be withheld is of no legal consequence and needs no supplement to aid its interpretation.

Asserting that this farmout agreement warrants the use of extrinsic evidence to inform the meaning as to the parties' obligations, JUSTICE GUZMAN assumes that a qualifier is necessary to

15

understand the parties' agreement as to consent. *See post* at ___. As explained above, however, the consent-to-assign provision is unambiguous—it imposes an obligation on Barrow-Shaver and none on Carrizo. We decline to read a qualifier into the consent-to-assign provision when the terms of the agreement make clear that Carrizo has no obligation and its right to withhold consent is thus unrestricted. *See N. Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 606–07 (Tex. 1998) (declining to impose a duty of reasonableness in the parties' contract because the contract did not provide an underlying obligation or duty). We conclude that the express language of the consent-to-assign provision can be construed with only one certain and definite interpretation—a consent obligation only as to Barrow-Shaver and no qualifications as to Carrizo's right to withhold consent.

### 1. Extrinsic Evidence

Although we hold that Carrizo's right to withhold consent is unqualified under the consent-to-assign provision, we next address the trial court's use of extrinsic evidence as an aid in construing the provision. At trial, Carrizo argued that the prior drafts of the farmout agreement and evidence of the parties' substantive negotiations of the consent-to-assign provision should be admitted to show that the parties specifically bargained for Carrizo to have an unqualified right to refuse consent to a proposed assignment. Even if a contract is unambiguous as a matter of law, a court "may still consider the surrounding 'facts and circumstances'" as an "aid in the construction of the contract's language." *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017) (quoting *Sun Oil Co.*, 626 S.W.2d at 731).

The parol evidence rule bars consideration of evidence that contradicts, varies, or adds to the terms of an unambiguous written agreement. *See, e.g.*, *Gannon v. Baker*, 818 S.W.2d 754, 755–56

16

(Tex. 1991) (per curiam). Evidence of prior or contemporaneous agreements is inadmissible as parol evidence when the contract is unambiguous. *See, e.g.*, *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 875 (Tex. 2010) (citation omitted). The parol evidence rule applies to writings that evidence the creation, modification, termination, or securing of a right or obligation under the contract. *See Gannon*, 818 S.W.2d at 755–56 (citation omitted). While "evidence of circumstances can be used to 'inform the contract text and render it capable of only one meaning,' extrinsic evidence can be considered only to interpret an *ambiguous* writing, not to create ambiguity." *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (emphasis added) (citations omitted). Here, evidence of the parties' substantive negotiations directly relates to the creation of the parties' unambiguous agreement. Therefore, the parol evidence rule bars consideration of evidence of the parties' substantive negotiations of the consent-to-assign provision.

We can consider the surrounding circumstances, however, including the fact that negotiations took place between sophisticated parties in this commercial oil and gas context. *See, e.g.*, *id.* (recognizing that a court may consider objective factors of the facts and circumstances surrounding the context of the parties' contract, such as the setting in which the contract was negotiated, commercial or otherwise (citation omitted)). In *URI, Inc. v. Kleberg County*, we explained that:

> the "facts and circumstances" extant at the time a contract is executed may be consulted only to inform the meaning of the language the parties chose to effectuate their accord. In construing an unambiguous contract or in determining whether an ambiguity exists, courts may not seek the parties' intent beyond the meaning the contract language reasonably yields when construed in context.

543 S.W.3d at 763. "[S]urrounding facts and circumstances cannot be employed to 'make the language say what it unambiguously does not say' or 'to show that the parties probably meant, or

17

could have meant, something other than what their agreement stated.'" *Id.* at 757 (citations omitted). Further, we believe that *National Union Fire Insurance of Pittsburgh v. CBI Industries, Inc.*, 907 S.W.2d 517 (Tex. 1995) (per curiam) is informative here. In that case, the Court acknowledged that extrinsic evidence—such as prior negotiations, prior dealings, and trade usage—may be admissible "to give the words of a contract a meaning consistent with that to which they are reasonably susceptible"—that is, "to 'interpret' contractual terms." *Id.* at 521 & n.6. "If the contract language is not fairly susceptible [to] more than one legal meaning or construction, however, extrinsic evidence is inadmissible to contradict or vary the meaning of the explicit language of the parties' written agreement." *Id.* at 521 (citations omitted). Agreeing with other courts that held the exclusion in the contract "is just what it purports to be—absolute," and rejecting the argument that limiting language should be read into the policies, the Court concluded that the language is "clear and susceptible of only one possible interpretation"—the policies unequivocally deny coverage. *Id.* at 522 (citation omitted). Because the contracts were unambiguous, the Court held there were no fact issues. *Id.* Thus, the unambiguous contract language controlled, and we would not consider extrinsic evidence to vary the meaning of the contract. *See id.*

Here, the consent-to-assign provision is likewise unambiguous, as explained above. The parties are sophisticated oil and gas entities that had representatives with extensive experience in the oil and gas industry. Each party was represented by counsel in this arm's-length transaction. The parties' experienced representatives considered and edited drafts of the agreement before coming to a final agreement. Accordingly, the surrounding circumstances establish that the consent-to-assign provision was a bargained-for exchange between the parties. *See Lillis*, 471. S.W.3d at

18

450. But those are the only facts and circumstances we can consider without delving into the parties' intent beyond what their agreement plainly yields. *See Murphy Expl.*, 560 S.W.3d at 109 (explaining that we may not consider surrounding circumstances to alter an unambiguous contract (citing *URI, Inc.*, 543 S.W.3d at 758)). And just as in *National Union Fire Insurance*, the unambiguous provision that purports to be absolute or unqualified controls, and therefore we may not consider extrinsic evidence that varies the agreement. *See* 907 S.W.2d at 521.

Barrow-Shaver asserts that despite the contract being unambiguous, its silence as to the circumstances under which Carrizo may withhold its consent to assign makes evidence of industry custom and usage admissible to construe the provision. Kramer, Barrow-Shaver's expert, testified that he believed industry custom played a role in illuminating the meaning of the consent-to-assign provision. Kramer stated that there are certain factors in the industry that oil and gas entities would consider before providing consent to assign. If those factors were unfavorable to the farmor, they would be reasons to deny consent. The factors ordinarily include the farmor "looking at the financial, technical expertise of the party to whom the assignment is being made" and "looking at [the potential assignee's] reputation within the oil and gas industry, both in terms of financial and technical and reputation for honesty." And he explained that "[i]n the context of this kind of farmout agreement, which entails multiple well development, where it could extend over an extensive period of time in order to develop the 22,000-acre Parkey lease, you want to know [whether] the [potential assignee] can be in there for the long haul." In his opinion, Carrizo's denial of consent based on Barrow-Shaver's refusal to pay Carrizo $5 million was a departure from industry custom. Kramer admitted, however, that his extensive treatise on oil and gas, *Williams and*

19

*Meyers Manual of Oil and Gas Terms*, does not mention the industry custom and usage he understood to be so common.

On the other hand, Campbell, Carrizo's expert, explained that in his opinion, industry custom does not demand that the farmor provide a reason for refusing consent under such a consent-to-assign provision. Campbell testified that the industry custom here would allow Carrizo to withhold its consent without specifying a reason because a farmor has the right to refuse to take the risk of dealing with a particular farmee-assignee.

Five amici curiae in this Court assert that consent requirements are a common feature in oil and gas leases, farmouts, and assignments, but that, in their experience, it is not customary for a consent holder to have the right to demand money for granting consent.[7] Four amici curiae assert that because not all oil and gas operators exercise the same diligence in their oil and gas operations, it is important for the consent holder to have a say in assignment of the operator's rights to another operator, and therefore consent holders do not need a reason to deny consent under consent-to-assign provisions such as the one at issue here.[8] Specifically, Professors Ernest Smith and Owen Anderson explained that, in their professional opinions, established industry custom and usage does not require

---

[7] These include: (1) Robert B. Rowling; (2) Roosth Production Company; Basa Resources, Inc.; Enrich Oil Corp.; Covey Park Energy, LLC; Van Operating, Ltd.; Tanos Exploration II, LLC; Cholla Petroleum, Inc.; Rippy Oil Co.; John H. Young, Inc.; and Joy Resources, Inc., collectively; (3) U.S. Operating, Inc.; (4) Middleton Oil Co.; and (5) Rockcliff Energy, LLC. Lake Ronel Oil Co. filed an amicus letter urging the Court to grant the case because this issue is of vital importance to the oil and gas industry, but it did not take a position on the issue. Additionally, Carrizo asserts that two of these five amici curiae maintain a financial interest in the outcome of this appeal.

[8] Those amici curiae are: (1) The Texas Land and Mineral Owners Association; (2) Professors Ernest E. Smith and Owen L. Anderson; (3) NARO-TX; and (4) Blackstone Minerals, L.P.

that denial of consent be reasonable and that if parties desire a reasonableness standard in a consent-to-assign provision, they negotiate and insert language to that effect.

As we have explained, evidence of surrounding facts and circumstances, including evidence of industry custom and usage, cannot be used to add, alter, or change the contract's agreed-to terms. *See, e.g.*, *URI, Inc.*, 543 S.W.3d at 758; *Nat'l Union Fire Ins.*, 907 S.W.2d at 521. When consideration of evidence as to industry custom and usage is appropriate, it is a question of fact for the jury, and it is the province of the jury to weigh witness credibility. *See Monarch Marking Sys. Co. v. Reed's Photo Mart, Inc.*, 485 S.W.2d 905, 906 (Tex. 1972) (submitting industry custom and usage to the jury in determining the meaning of "MM" as "million"); *see also Jelinek v. Casas*, 328 S.W.3d 526, 538 (Tex. 2010) ("Courts should not usurp the jury's role as fact finder, nor should they question the jury's right to believe one witness over another."). Industry custom and usage may inform the meaning of words that may carry their plain meaning in some contexts, but may also carry a special meaning in the context of a particular industry. *See Monarch Marking Sys. Co.*, 485 S.W.2d at 906; *Dwyer v. City of Brenham*, 7 S.W. 598, 599 (Tex. 1888); *Hellenic Inv., Inc. v. Kroger Co.*, 766 S.W.2d 861, 866 (Tex. App.—Houston [1st Dist.] 1989, no writ) ("As a general rule, parties are presumed to contract in reference to the usage or custom prevailing in the particular trade or business to which the contract relates, and evidence of custom or usage . . . is generally admissible to assist the factfinder in ascertaining the parties' true intent." (citations omitted)).

Industry custom and usage is often invoked to shed light on the meaning of oil and gas related contract provisions, such as those found in leases, farmouts, and operating agreements. *See* RESTATEMENT (SECOND) OF CONTRACTS § 222(3) (AM. LAW INST. 1981) ("[A] usage of trade in the

vocation or trade in which the parties are engaged . . . gives meaning to or supplements or qualifies their agreement."). Indefinite terms may be given precision by usage of trade or course of dealing between the parties in the absence of an agreement to the contrary. *See Fischer*, 479 S.W.3d at 239–40 (citing RESTATEMENT (SECOND) OF CONTRACTS § 33 cmt. a (AM. LAW INST. 1981). As explained above, when a contract is unambiguous, we do not consider outside evidence, including industry custom and usage, to alter or contradict the terms. *See, e.g.*, *URI, Inc.*, 543 S.W.3d at 757–58; *Nat'l Union Fire Ins.*, 907 S.W.2d at 520–21. The meaning of "express written consent" within a contract is clear, is not susceptible to more than one meaning, and is not industry or vocation specific. *See Nat'l Union Fire Ins.*, 543 S.W.3d at 521 n.6. Likewise, when a contract is unambiguous yet silent as to an immaterial, non-essential term, it requires no further supplementation. *See Fischer*, 479 S.W.3d at 238–40; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 221 (AM. LAW INST. 1981) (supporting that courts cannot rely on evidence of industry custom to add a term that is not essential to an otherwise enforceable agreement); RESTATEMENT (SECOND) OF CONTRACTS § 204 (AM. LAW INST. 1981) (explaining that when parties have not agreed to an essential term in a contract, courts will supply a reasonable term). To supplement so clear and easily understood a provision containing "express written consent" with extrinsic evidence, as Barrow-Shaver would have us do, would make almost every term, word, or phrase in every agreement, and any obligation not in an agreement, susceptible to litigation and ultimately a jury determination based on competing expert testimony, regardless of clarity.[9]

---

[9] For example, if a consent-to-assign provision stated that a farmee cannot assign its rights without the express written consent of the farmor and the farmor's consent cannot be unreasonably withheld, then a fact issue may arise as to the meaning of "unreasonably withheld." It that case, evidence of industry custom and testimony would likely be appropriate. But when the provision states that a party may not assign its interest without another party's express written

22

Further, allowing evidence of industry custom and usage here would give the jury an opportunity to create an ambiguity where none exists, or to alter the terms of the contract's clear and unequivocal language as to the parties' obligations. *See URI, Inc.*, 543 S.W.3d at 766 (noting that "discovery was unnecessary to interpret the policies' unequivocal language, because such discovery could only lead to improper parol evidence of subjective intentions" in trying to assert a latent ambiguity (discussing *Nat'l Union Fire Ins.*, 907 S.W.2d at 521–22)). We decline to allow evidence of industry custom to import an obligation that does not exist in the contract—evidence introduced for the sole purpose of inviting the jury to qualify Carrizo's right to withhold consent when Carrizo bears no consent obligation under the farmout agreement. Were we to allow such evidence for such a purpose, we would vitiate the parties' express agreement that Barrow-Shaver cannot assign its rights without Carrizo's consent, and we would rewrite the parties' agreement to say that Barrow-Shaver is entitled to assign its rights, or reap the benefit of a proposed assignment, even without Carrizo's consent. *See Conoco, Inc.*, 986 S.W.2d at 606–07 (refusing to imply a duty of good faith into the parties' contract because their contract did not provide the underlying obligation or duty concerning the obligation to which the duty of good faith would attach). We will not do so. It is not the province of the jury to decide whether a contract is ambiguous or to interpret a bargained-for provision in an unambiguous contract, and the jury may not imply an obligation into an unambiguous contract. *See generally J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Nor is it our province to change the terms of the parties' unambiguous agreement. *See, e.g.*,

---

consent, the meaning of "express written consent" is generally understood. Without an indication in the contract that the parties intended to apply some sort of technical meaning to the term, evidence of industry custom and usage should not be considered.

*Am. Mfrs. Mut. Ins. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) ("[W]e may neither rewrite the parties' contract nor add to its language." (citation omitted)).

In addition to our precedent, the Restatement also supports that courts cannot rely on evidence of industry custom or usage to add a term that is not essential to an otherwise enforceable agreement. *See* RESTATEMENT (SECOND) OF CONTRACTS § 221 (AM. LAW INST. 1981). "An agreement is supplemented or qualified by a reasonable usage with respect to agreements of the same type if each party knows or has reason to know of the usage and neither party knows or has reason to know that the other party has an intention inconsistent with the usage." *Id.* A court may only rely on industry custom or usage when "in the absence of usage," it would "supply a reasonable term." *Id.* § 221 cmt. a. A court may only "supply a reasonable term" when it is essential to enforcing an otherwise unenforceable agreement. *Id.* § 204 ("When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."); *see also* 12 WILLISTON ON CONTRACTS § 34:3 (4th ed. 2019) ("[T]rade usages and customs can be incorporated into a contract in order to remedy a deficiency in the agreement when the agreement obviously omits an essential provision."). In other words, if a contract omits a term, yet includes all the necessary terms to make the agreement enforceable, courts may *not* imply a reasonable term. RESTATEMENT (SECOND) OF CONTRACTS §§ 204, 221 (AM. LAW INST. 1981); *see also Centex Homes*, 95 S.W.3d at 273–74 (providing that courts will not imply a warranty of good

24

workmanship if the parties express a contrary intention).[10] As explained above, the Court need not supplement the consent-to-assign provision because the agreement may be enforced as written.

JUSTICE GUZMAN's use of industry custom to imply a reasonableness obligation into the consent-to-assign provision, *see post* at ___, is a veiled attempt to use industry custom and usage to create a covenant of reasonableness and good faith applicable, at a minimum, to farmout agreements and probably to every contract with a consent provision, if not every contract of any type. Using industry custom in the manner JUSTICE GUZMAN proposes would open the door to litigating the meaning of every term in every contract and any obligation not in a contract, creating lucrative business opportunities for so-called experts in every industry and allowing juries to imply obligations to which parties did not agree.

Moreover, it defies reason to use the evidence of industry custom and usage and yet disregard other extrinsic evidence, such as the parties' underlying negotiations, as JUSTICE GUZMAN would do. *See post* at ___. Although we hold that the parol evidence rule bars consideration of the negotiation evidence, if, as JUSTICE GUZMAN contends, evidence of industry custom and usage were appropriate to give precision to the meaning of "consent" in this context, then evidence of the parties' underlying negotiations would also be necessary to understand the parties' intent as to that custom and usage. *See URI*, 543 S.W.3d at 764–65 (explaining that facts and circumstances at the time of the contract's formation may be used only to inform the meaning of the language the parties

---

[10] For example, when a contract requires goods to be delivered to "the green house on Pecan Street" but there are two green houses on Pecan Street, the question of which green house is essential to the contract's enforcement, and the court may imply a reasonableness term in accordance with the parties' intent. *See URI*, 543 S.W.3d at 765–66. So too may a court use industry custom or usage to supply a reasonable term, but only when it is essential to the contract's enforcement and does not transform the meaning of the contract by adding to, altering, or contradicting the terms of the agreement itself. *See id.* at 768–69.

25

chose); *Nat'l Union Fire Ins.*, 907 S.W.2d at 521–22 (stating that extrinsic evidence of prior negotiations, prior dealings, and trade usage may be admissible to give the words of a contract meaning consistent with generally accepted meaning, but cannot be used to vary or contradict the agreement (citations omitted)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 222 (AM. LAW INST. 1981) (suggesting that evidence showing that parties agreed not to follow the trade usage will override trade custom and usage evidence, indicating that evidence of a clear intent to contract around industry custom and usage would be admissible). But not only does JUSTICE GUZMAN advocate using industry custom to alter the agreement—implying an obligation that does not exist—she also would not allow use of evidence of the parties' underlying negotiations, even when it clearly shows that the parties intended for the consent-to-assign provision not to contain any reasonableness requirement or obligation on Carrizo's part.

Further, under Texas's strong policy favoring the freedom to contract, parties are free to contract around established industry custom and usage. *See, e.g.*, *Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 59 (Tex. 2016); *Phila. Indem. Ins. v. White*, 490 S.W.3d 468, 471 (Tex. 2016). Because parties may agree to contract terms that are consistent or inconsistent with industry custom and usage, evidence of industry custom and usage is not dispositive as to the parties' intent or the meaning of the parties' agreement. Such evidence can be informative as to the parties' intent only when the plain language of their agreement is ambiguous. In *Kachina Pipeline Co. v. Lillis*, we explained:

> Amici have made it clear that downstream centralization of compression is both common and critical to the efficient transportation of gas to market. We do not doubt that, and we do not doubt that producers often contract to share in such costs. But the agreement does not express an objective intent that [the party] would do so,

26

and *industry custom cannot impose obligations beyond those within the written agreement*.

471 S.W.3d at 453–54 (emphasis added) (citation omitted); *see also Murphy Expl.*, 560 S.W.3d at 109, 113 (acknowledging that we will not impose more stringent obligations unless the parties clearly intended to do so); *Nat'l Union Fire Ins.*, 907 S.W.2d at 521–22 (declining to consider industry custom because the contract language was clear and unambiguous on its face and in application). While we do not doubt that farmees generally expect farmors not to withhold consent unreasonably, and we do not doubt that farmors generally will not condition consent on the payment of millions of dollars, this does not inform our understanding of what the parties agreed to here, which is expressed in their written agreement. We hold that evidence of industry custom and usage cannot be considered here, and there was no issue for the jury to decide as to construction of the consent-to-assign provision.

## 2. Implied Duty or Covenant

In relying on industry custom and usage to argue that Carrizo can withhold consent only when it is reasonable to do so, Barrow-Shaver essentially advocates for an implied obligation that Carrizo justify a decision not to consent and an implied obligation that Carrizo not withhold consent unreasonably, arbitrarily, or "illegitimately." As explained above, any such implied obligations are not based on the meaning of "express written consent," as there is no indication in the contract that the parties intended a meaning other than the ordinary, non-technical meaning of the term. Rather, any such reasonableness obligation must be based on the consent-to-assign provision's language providing that Barrow-Shaver's rights under the farmout agreement "may not be assigned . . . without express written consent of Carrizo."

27

As we have discussed, that language imposes an obligation only on Barrow-Shaver—if Barrow-Shaver wants to assign its rights, it must obtain Carrizo's express written consent. The provision imposes no obligation on Carrizo. The provision does not require Carrizo to explain its reasons for withholding consent, nor does the provision impose any constraints on withholding consent or qualify the consent requirement in any way other than requiring it to be written and express. Barrow-Shaver's reading of the contract, however, would obligate Carrizo to provide a reason for its denial of consent and would require that the denial satisfy some standard—specifically, that denial of consent not be unreasonable, arbitrary, or illegitimate. And under Barrow-Shaver's interpretation, Carrizo's failure to meet the standard could result in either Barrow-Shaver's assignment over Carrizo's objection or in Barrow-Shaver otherwise benefitting from a lost assignment opportunity.

We are hesitant to imply terms into contracts. *See, e.g.*, *Murphy Expl.*, 560 S.W.3d at 111–13 (declining to read any implied proximity requirement concerning an offset well into a lease provision); *URI, Inc.*, 543 S.W.3d at 771 n.81 (explaining that we will not imply restraints for which the parties have not bargained); *Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 646 (Tex. 1996) (recognizing that courts have long refused to imply restraints that are absent from the agreement). "Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done." *See Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508, 510 (Tex. 1947). The Texas Business and Commerce Code provides that "[e]very contract or duty within this title imposes an obligation of good faith in its performance and enforcement." TEX. BUS. & COM. CODE § 1.304 (applying to all contracts, not just

28

sale of goods); *see also Conoco, Inc.*, 986 S.W.2d at 606–07; U.C.C. § 1-304 (AM. LAW. INST. & UNIF. LAW COMM'N 2018). But this Business and Commerce Code provision is not applicable where no specific obligation exists. *See generally Conoco, Inc.*, 986 S.W.2d at 606–07.

We examined the Business and Commerce Code's good faith requirement in *Northern Natural Gas Co. v. Conoco, Inc.*, in which Conoco argued that a duty of good faith should be imposed upon Northern Natural Gas in canceling a gas purchase contract. *See id.* at 606–07. The Court declined to imply a duty of good faith into the parties' contract because their contract did not provide the underlying duty or obligation at issue, explaining that nowhere did the contract impose a duty upon Northern Natural Gas to maintain the contracts, and "[i]n the absence of a specific duty or obligation to which the good-faith standard could be tied, section [1.304 could] not support Conoco's claim for damages." *See id.* (citing TEX. BUS. & COM. CODE § 1.203 (current version at § 1.304)); *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 170 (Tex. 2009) ("Because the contracts unambiguously do not impose an obligation . . . contract damages . . . are not recoverable."). Similarly, here the consent-to-assign provision imposes no duty or obligation on Carrizo—the obligation is on Barrow-Shaver to obtain Carrizo's consent to assign. Therefore, there is no consent duty or obligation to which a good faith or reasonableness standard could attach.

A duty of good faith and fair dealing may arise when the contract governs or creates a special relationship. *See Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225 (Tex. 2002) (citation omitted). Contracts that give rise to the duty in the oil and gas context include contracts between executive-right holders and non-participating royalty-interest owners, as well as contracts between working-interest owners and royalty owners. *See Manges v. Guerra*, 673 S.W.2d

29

180, 183 (Tex. 1984); *Amoco Prod. Co. v. First Baptist Church of Pyote*, 611 S.W.2d 610, 610 (Tex. 1980) (per curiam). The duty of good faith and fair dealing stems from the relationship of the parties and not from the contract. *See Manges*, 673 S.W.2d at 183 (citing *English v. Fischer*, 660 S.W.2d 521, 524–25 (Tex. 1983) (Spears, J., concurring)). However, this Court has been clear that absent a special relationship, parties to a contract have no duty to act in good faith. *See El Paso Nat. Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312–313 (Tex. 1999) (citation omitted).

Barrow-Shaver points to our imposition of a duty of good faith and fair dealing in the insurance context as support for implying such a duty into consent-to-assign provisions in farmout agreements. In the insurance context, we have held that the insurer owes a duty of good faith to the insured because a special relationship arises out of the parties' inherently unequal bargaining positions and because the nature of insurance contracts would allow unscrupulous insurers to take advantage of the insured. *See, e.g.*, *Arnold v. Nat'l Cty. Mut. Fire Ins.*, 725 S.W.2d 165, 167 (Tex. 1987). In the contexts in which we have recognized special relationships, these relationships were predicated upon an imbalance in bargaining power between the parties and the unequal opportunity for one party to take advantage of the other. *See, e.g.*, *id.* We have not extended the duty of good faith and fair dealing to farmout agreements between sophisticated parties, and we decline to do so here. A farmout agreement does not create inherently unequal bargaining power or give one of the parties an opportunity to take advantage of the other, especially when both parties are highly sophisticated oil and gas entities. And here, those sophisticated parties specifically negotiated the farmout agreement—a specialized oil and gas agreement between a lessee and an entity who has the

30

resources to drill on the prospect—in an arm's-length transaction. We conclude that there is no special relationship in the farmout context to give rise to a duty of good faith and fair dealing.

Additionally, we have long held that there is not an implied covenant of good faith and fair dealing in every contract. *See Zachry Constr. Corp. v. Port of Hous. Auth. of Harris Cty.*, 449 S.W.3d 98, 116–17 (Tex. 2014) (acknowledging that Texas does not recognize a duty of good faith and fair dealing imposed in contractual obligations) (citing *English*, 660 S.W.2d at 522); *Winters v. Hous. Chronicle Publ'g Co.*, 795 S.W.2d 723, 724 n.2 (Tex. 1990) (pointing out that we have declined to imply a duty of good faith and fair dealing into employment contracts (citation omitted)); *see also Hux v. S. Methodist Univ.*, 819 F.3d 776, 781 (5th Cir. 2016) (recognizing that "Texas law does not impose a generalized contractual duty of good faith and fair dealing and, in fact, rejects it in almost all circumstances" (citing *English*, 660 S.W.2d at 522)). We have rejected the argument that we should imply into contracts a covenant that would require the parties not to do anything that injures the right of another party to receive the benefits of the agreement. *See Zachry*, 449 S.W.3d at 116–17.

In *English v. Fischer*, we explained that to imply into every contract a covenant of good faith and fair dealing that "there is an implied covenant that neither party will do anything which injures the right of the other party to receive the benefits of the agreement" would be "contrary to our well-reasoned and long-established adversary system which has served us ably in Texas for almost 150 years." 660 S.W.2d at 522. Adoption of this covenant in every contract would "abolish our system of government according to settled rules of law and let each case be decided upon what might seem 'fair and in good faith,' by each fact finder." *Id.* Likewise, to impose a covenant here that Carrizo

31

could not unreasonably withhold its consent would be contrary to our long-standing principles of contract law that parties are free to contract for their own duties and obligations. *See, e.g.*, *id.*; *Coyote Lake Ranch, LLC*, 498 S.W.3d at 59; *White*, 490 S.W.3d at 471. The farmout agreement reflects that Barrow-Shaver and Carrizo contracted for Barrow-Shaver to have the obligation to obtain consent before it can assign its rights. And the language "without express written consent" indicates that the parties bargained to prohibit any implied consent at all. *See Express*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("[T]o give a full and explicit statement."); *see also Express*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Clearly and unmistakably communicated; stated with directness and clarity."); *Express Consent*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Consent that is clearly and unmistakably stated."). We refuse to rewrite agreements between experienced and sophisticated parties, such as Barrow-Shaver and Carrizo, and implying an obligation of good faith or reasonableness into this contract would do just that. *See, e.g.*, *Fischer*, 479 S.W.3d at 239 ("[W]e may neither rewrite the parties' contract nor add to its language." (quoting *Schaefer*, 124 S.W.3d at 162).

Moreover, Texas courts have declined to read a reasonableness standard into consent provisions that failed to articulate a standard by which consent could be withheld. *See*, *e.g.*, *Trinity Prof'l Plaza Assocs. v. Metrocrest Hosp. Auth.*, 987 S.W.2d 621, 625 (Tex. App.—Eastland 1999, pet. denied); *Reynolds v. McCullough*, 739 S.W.2d 424, 429 (Tex. App.—San Antonio 1987, writ denied); *Mitchell's, Inc. v. Nelms*, 454 S.W.2d 809, 813 (Tex. App.—Dallas 1970, writ ref'd n.r.e.). In these situations, Texas courts have held that the lessor has the absolute right to withhold consent. *See*, *e.g.*, *Trinity Prof'l Plaza Assocs.*, 987 S.W.2d at 625 (holding that a lease agreement contained

32

no requirement to act reasonably in withholding consent to transfer); *Reynolds*, 739 S.W.2d at 429 (explaining that absent the promise not to unreasonably withhold consent to assign, there is no implied covenant by the lessor to act reasonably in withholding consent); *Mitchell's, Inc.*, 454 S.W.2d at 813 (concluding that a breach may occur which gives rise to damages when the lease expressly states that a lessor will not unreasonably withhold its consent and then unreasonably withholds its consent); Robertson et al., CONSENT TO ASSIGNMENT PROVISIONS IN TEXAS OIL AND GAS LEASES: DRAFTING SOLUTIONS TO NEGOTIATION IMPASSE, 48 TEX. TECH. L. REV. 335, 340 (2016) (explaining that it is "extremely important for a lessee that some standard be articulated, whether it is a reasonableness standard . . . or a specifically enumerated objective standard"). The Fourth Court of Appeals explained, in the lease context:

> The limitation on the transfer of a leasehold estate is for the lessor's sole benefit. A lessor may contract, by provision in the lease, not to unreasonably withhold his consent to an assignment or sublease of the premises. This type of provision is in the nature of a promise or covenant which, if breached, could be grounds for an action for damages. Absent this promise, we hold that there is no implied covenant by the lessor to act reasonably in withholding his consent.

*Reynolds*, 739 S.W.2d at 429 (citation omitted). Another court of appeals noted similarly that an interest holder "may contract, by provision in the [agreement], not to unreasonably withhold his consent to an assignment . . . . This type of provision is in the nature of a promise or covenant which, if breached, could be grounds for an action for damages." *Trinity Prof'l Plaza Assocs.* 987 S.W.2d at 625 (quoting *Reynolds*, 739 S.W.2d at 429). Absent this promise, the court held, "there is no implied covenant by the lessor to act reasonably in withholding his consent." *Id.* (quoting *Reynolds*, 739 S.W.2d at 429).

We find the reasoning of those courts of appeals persuasive and consistent with our contract law, and we decline to imply a reasonableness standard into the consent-to-assign provision here. The parties' agreement establishes one obligation—Barrow-Shaver must obtain Carrizo's express written consent before it can assign its rights—and it imposes no obligation upon Carrizo. We will not impose a duty upon Carrizo for which the parties did not contract. *See Murphy Expl.*, 560 S.W.3d at 113.

Further, in the context of oil and gas leases that expressly define a duty, "we will not impose a more stringent obligation unless it is clear that the parties intended to [do so]." *Id.* at 108–09 (quoting *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011)). While this is a farmout agreement and not a lease, we see no reason why the same principle should not apply. As in the lease context, we decline to read into a farmout agreement more stringent obligations than the parties intended, as expressed by the negotiated, agreed-to language. *See generally id.*

We also decline to read a reasonableness requirement into the consent-to-assign provision as a way to avoid any impermissible restraint on alienation. "A servitude that imposes a direct restraint on alienation of the burdened estate is invalid if the restraint is unreasonable. Reasonableness is determined by weighing the utility of the restraint against the injurious consequences of enforcing the restraint." RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 3.4 (AM. LAW INST. 2000). "Determining [the] reasonableness of a restraint on alienation requires balancing the utility of the purpose served by the restraint against the harm that is likely to flow from its enforcement." *See id.* cmt. c.

34

In a farmout, the mineral interest is conveyed to the farmee after the farmee's services are rendered and obligations satisfied, and not just after consideration is paid; therefore, the farmor has an interest in monitoring the manner in which and by whom the services are rendered. *See Farmout Agreement*, WILLIAMS & MEYERS MANUAL OF OIL AND GAS TERMS (16th ed. 2015). As mentioned above, Barrow-Shaver's expert testified about factors a farmor may consider in deciding whether to consent to the farmee's assignment to a particular entity. While we express no opinion on any such reasons Carrizo may have had for refusing consent, we note that our contract law allows for risk allocation by agreement. *See El Paso Field Servs.*, 389 S.W.3d at 810 (declining to disallow parties to define requirements by contract and allocate risk by agreement, "a result that runs counter to the freedom to contract," and refusing "to amend the contract judicially to substitute an unsupported standard for the contracted-for requirement" (citation omitted)). The provision to which the parties agreed would allow Carrizo to assess the risk of assigning the farmout and decline to consent if it deemed the risk too high. And a reasonable party with Barrow-Shaver's experience and sophistication would have assessed the risk of entering into a farmout agreement that does not qualify Carrizo's right to withhold consent—an agreement that could make Barrow-Shaver's rights un-assignable—and signed only if it deemed that risk acceptably low. We decline to disturb the risk allocation to which the parties agreed. Considering the interests in the parties' farmout, we will not imply a reasonableness standard here. *See Hurd Enters., Ltd. v. Bruni*, 828 S.W.2d 101, 107–12 (Tex. App.—San Antonio 1992, writ denied) (declining to impose a duty of good faith and fair dealing arising from the marketing obligation of the lessee and from the unequal bargaining position of the parties in a lessor–lessee situation); *Texstart N. Am., Inc. v. Ladd Petroleum Corp.*, 809

S.W.2d 672, 677–78 (Tex. App.—Corpus Christi–Edinburg 1991, writ denied) (rejecting the argument that a consent provision in a joint operating agreement "implied [a] duty of mutual cooperation for the common benefit of all" or implied a "duty of utmost good faith and fair dealing" because the parties' agreement was unambiguous as to when consent could be withheld).

The obligation Barrow-Shaver asks us to imply—that Carrizo not act unreasonably in withholding consent—amounts to an implied covenant to act reasonably and in good faith. The contract imposes no such duty, and our precedent does not support implying one. We hold that Carrizo's right to withhold consent to a proposed assignment is unqualified.

### B. Meaning of the Consent-to-Assign Provision

In construing the contract, our task is to ascertain its meaning. *See, e.g.*, *Murphy Expl.*, 560 S.W.3d at 108–09 (citations omitted); *Sun Oil Co.*, 626 S.W.2d at 727–28, 731 (citations omitted). Given that the parties do not dispute that Carrizo has a right to withhold consent under the farmout agreement, and our holding that Carrizo's right to withhold consent is unqualified, we next address the meaning of such an unqualified right. The court of appeals held that, under the farmout agreement, Carrizo is entitled to refuse consent for any reason or no reason at all. 516 S.W.3d at 96. Barrow-Shaver argues that the consent-to-assign provision cannot mean that Carrizo can prevent an assignment for purely illegitimate reasons that amount to extortion. While we have explained that the consent-to-assign provision imposes no obligation on Carrizo, it is prudent to further explain the provision's meaning as to the parties' rights and obligations.

In negotiating the consent-to-assign provision, the parties had two options: (1) an unqualified right to withhold consent, which would impose an absolute requirement on Barrow-

36

Shaver to obtain Carrizo's consent before it could assign its contractual rights, or (2) a qualified right to withhold consent, which would impose less than an absolute consent requirement on Barrow-Shaver and, importantly, would impose an obligation on Carrizo. Under the first option, Carrizo would be able to prevent Barrow-Shaver from assigning its rights. Because the right to withhold consent would be unqualified, Carrizo could refuse consent for any reason, expressed or not, reasonable or not, legitimate or not, or no reason at all. Under the second option, Carrizo's ability to prevent an assignment would be limited by some sort of standard. This would require Carrizo to provide a reason for withholding consent, and if that reason did not meet the agreed-to standard—reasonable or not arbitrary, for example—then Carrizo presumably could not stand in the way of Barrow-Shaver's assignment. And it would allow for the possibility of Barrow-Shaver to benefit from assignment without having obtained Carrizo's consent, either by assigning its rights despite the refusal to consent or by recovery of contractual damages for a lost assignment opportunity. While the second option, a qualified right to withhold consent, could vary depending on the standard adopted, the choice here was binary—an unqualified, absolute right to prevent an assignment, or a qualified, limited right to withhold consent that would prevent an assignment only if an acceptable reason were provided.

The consent-to-assign provision to which Barrow-Shaver and Carrizo agreed simply provides that Barrow-Shaver cannot assign its rights unless Carrizo gives its express written consent. In no way does the agreement suggest that Carrizo must justify its denial of consent, that the denial of consent must meet some standard, that Barrow-Shaver has the right to challenge Carrizo's reason for denying consent, or that Barrow-Shaver can assign its rights without Carrizo's consent meeting

37

any requirement other than the two explicitly stated (express and in writing). By not addressing the circumstances under which Carrizo could withhold consent, the agreement speaks to the parties' agreement—an unqualified right to withhold consent. In fact, had the consent-to-assign provision explicitly stated that Carrizo could withhold its consent "for any reason or no reason," such language would be surplusage because the phrase "may not be assigned . . . without the express written consent of Carrizo" has identical meaning. The same can be said if the provision added "which can be granted or withheld at Carrizo's sole discretion." Adding language to this effect would have been unnecessary and meaningless given the unambiguous language the parties chose in the farmout agreement. Given the plain, unambiguous language of the consent-to-assign provision, we conclude that Barrow-Shaver has the absolute obligation to obtain Carrizo's consent, and Carrizo has no obligation as to when, how, or why it may withhold its consent to assign. Therefore, the contract means that Carrizo holds the power through non-consent to prevent Barrow-Shaver from assigning its rights in the farmout. And, under the agreement, Carrizo could withhold its consent to assign to Raptor as it did here.

Because we conclude that the contract unambiguously allowed Carrizo to refuse its consent for any reason, Carrizo could not breach the parties' farmout agreement for withholding its consent as a matter of law. *See generally El Paso Field Servs.*, 389 S.W.3d at 812 (concluding that the jury's findings on breach of contract were immaterial, and upholding the trial court's judgment that the contract was unambiguous); *Columbia Gas Transmission Corp. v. New ULM Gas, Ltd.*, 940 S.W.2d 587, 593 (Tex. 1996) (rendering judgment for the defendant when the contract was unambiguous and the parties' intent should not have been submitted to the jury). Therefore, we

agree with the court of appeals' conclusion that the breach of contract issue should not have been submitted to the jury.

### C. Public Policy Implications

Texas has a strong public policy not to hinder the exploration and development of oil and gas. *See generally Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 34, 39 (Tex. 2008); *Hastings Oil Co. v. Tex. Co.*, 234 S.W.2d 389, 390 (Tex. 1950); *Brown v. Humble Oil & Ref. Co.*, 83 S.W.2d 935, 938 (Tex. 1935). And Texas has long recognized the principle that parties are free to contract as they see fit as long as their agreement does not conflict with public policy. *E.g., Coyote Lake Ranch, LLC*, 498 S.W.3d at 59. We recognize the important public policy favoring the exploration and development of oil and gas. *See generally Coastal Oil & Gas Corp.*, 268 S.W.3d at 39. However, we refuse to extend that public policy in favor of rewriting agreements between experienced, sophisticated parties.

Contrary to the assertions in JUSTICE GUZMAN's dissent, our holding today does not conflict with our well-established public policy in favor of the exploration and development of oil and gas. *See post* at ___. In fact, JUSTICE GUZMAN's view would run afoul of our public policy and would negatively impact oil and gas litigation. Under a farmout agreement, the lessee chooses to farm out its drilling obligation to another operator in exchange for a transfer of interest upon the drilling of a successful well. *See Farmout Agreement*, WILLIAMS & MEYERS MANUAL OF OIL AND GAS TERMS (16th ed. 2015). A lessee generally would not choose to farm out its obligation to an unsophisticated party because the lessee bears the risk of failed drilling and would therefore look to farm out to an experienced operator. *See generally id.* JUSTICE GUZMAN's dissent asserts that Carrizo effectively

prevented the development of oil and gas under the farmout, and underlying lease, by refusing to consent to Barrow-Shaver's proposed assignment. *See post* at ___. But JUSTICE GUZMAN's dissent fails to recognize that Carrizo, and farmors generally, have an ongoing interest in exercising caution as to the operator obligated to drill. In arguing that we should reinstate the jury's verdict, JUSTICE GUZMAN's dissent assumes that Carrizo was not acting reasonably in desiring that Raptor not be the operator that developed the minerals and discounts that Carrizo, as the farmor, had a significant interest in ensuring that the drilling not be done by an operator it deemed too risky. *See post* at ___. Thus, using the jury's finding as to industry custom to hold that a farmor has to justify withholding its consent would actually seem to hinder the development of oil and gas. *See generally Coastal Oil & Gas Corp.*, 268 S.W.3d at 39.

Despite JUSTICE GUZMAN's assertion to the contrary, *see post* at ___, our holding does not give Carrizo, or another similarly situated party, permission to extort a multimillion, last-minute payment in exchange for consent. In fact, the record does not demonstrate that happened. After initially declining to consent to Barrow-Shaver's assignment to Raptor, Carrizo later gave Barrow-Shaver a different offer intended to satisfy both sides—Carrizo offered Barrow-Shaver the ability to buy out its interest as the lessee in the underlying lease for $5 million, which would have given Barrow-Shaver the benefits and risks of being the working-interest owner, allowing it to assign its rights to Raptor. This is far different from an extortion scheme to charge $5 million for consent at the eleventh hour while retaining the lessee interest, as JUSTICE GUZMAN contends. Our holding simply recognizes the obligations the contract imposes—Barrow-Shaver must obtain Carrizo's consent if it wants to assign its contractual rights—and the obligations it does not impose—Carrizo

40

need not provide a reason if it chooses not to consent, nor is Carrizo under any obligation when asked to give consent. Our holding does not run afoul of our long-established oil and gas principles.

### III. Fraud

Finally, we consider whether the court of appeals erred in holding that there was no evidence to support the justifiable reliance element of Barrow-Shaver's fraud claim. Barrow-Shaver argues that it signed the farmout agreement—containing the consent-to-assign provision with no qualifying "cannot be unreasonably withheld" language—because Carrizo assured Barrow-Shaver that Carrizo would consent. Carrizo counters that Barrow-Shaver could not justifiably rely on any assurances of consent when the farmout agreement's consent-to-assign provision directly and unambiguously addressed consent to assign. Carrizo also argues that any reliance is not justified because Barrow-Shaver knew that Laufer, the landman who negotiated the consent-to-assign provision on Carrizo's behalf, was not authorized to bind the company.

To establish fraud, a plaintiff must show that: (1) the defendant made a false, material representation; (2) the defendant "knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth;" (3) "the defendant intended to induce the plaintiff to act upon the representation;" and (4) the plaintiff justifiably relied on the representation, which caused the plaintiff injury. *Orca Assets G.P., L.L.C.*, 546 S.W.3d at 653 (citing *Ernst & Young, L.L.P v. Pac. Mut. Life Ins.*, 51 S.W.3d 573, 577 (Tex. 2001)); *see also Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018) (citations omitted). A representation is material if the representation was important to the plaintiff in making a decision, such that a reasonable person would be induced to act on and attach importance to the representation in making the decision. *See*

41

*Italian Cowboy Partners*, 341 S.W.3d at 337 (citations omitted). The representation may be material even if it was not the only factor inducing the plaintiffs to make the decision or enter into the transaction, but the plaintiff must have relied on the misrepresentation. *See Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 727–28 (Tex. App.—Waco 1998, pet. denied) (citations omitted). A representation is false if it consists of words or other conduct that suggest to the plaintiff that a fact is true when it is not. *See Custom Leasing, Inc. v. Tex. Bank & Tr. Co.*, 516 S.W.2d 138, 142 (Tex. 1974) (citation omitted). To establish the fourth element, "the plaintiff must show that it actually relied on the defendant's representation and, also, that such reliance was justifiable." *Orca Assets*, 546 S.W.3d at 653 (citing *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)). Only the fourth element is at issue in this appeal.[11]

The jury found in favor of Barrow-Shaver on its fraud claim, but the court of appeals reversed, holding that no evidence supported the justifiable reliance element of Barrow-Shaver's fraud claim. 516 S.W.3d at 98. In doing so, the court of appeals concluded, "No matter how much confidence Barrow-Shaver and Bertram had in Laufer's oral promise that Carrizo's consent would not be unreasonably withheld, their reliance is of no consequence in light of the unambiguous term in the written contract that directly contradicts the oral representation." *Id.*

While they were negotiating the consent-to-assign provision, Laufer promised Bertram on three separate occasions that although Carrizo insisted on deleting the "shall not be unreasonably withheld" language, Carrizo would work with Barrow-Shaver on any future assignment and would

---

[11] Carrizo does not assert that Laufer did not know the promise was false or that he did not have any reckless intent in making the promise. Carrizo also does not challenge whether the alleged statements were actually false, material representations.

give consent. Laufer said, "It won't be a problem" and "Don't worry about it. We will work with you. We will promise you . . . the consent and it won't be a problem."

We review whether, as a matter of law, Carrizo could have committed fraud—specifically, whether Barrow-Shaver could have justifiably relied on Carrizo's representations. *See Orca Assets*, 546 SW.3d at 653 ("Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise." (quoting *Wilson*, 168 S.W.3d at 823)). "Justifiable reliance usually presents a question of fact" for the jury to decide. *Id.* at 654 (citation omitted). But justifiable reliance may "be negated as a matter of law when circumstances exist under which reliance cannot be justified." *Id.* (citations omitted). To determine whether, as a matter of law, justifiable reliance has been negated, we must consider the contract and the nature of the parties' relationship. *See id.*

We recognize a long-standing principle that a "party claiming fraud has a duty to use reasonable diligence in protecting his own affairs"—specifically that "[i]n an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests and is charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated." *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962) (citation omitted); *see also Orca Assets*, 546 S.W.3d at 654. A "failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party." *Thigpen*, 363 S.W.2d at 251 (citation omitted). Accordingly, a plaintiff may not "blindly rely on a representation by a defendant" when the plaintiff's knowledge, experience, and background alert it to investigate

43

the defendant's representations before acting in reliance on those representations. *See Orca Assets*, 546 S.W.3d at 654 (citation omitted).

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.* is particularly relevant here. In that case, we determined whether a mineral interest lessee's reliance on extra-contractual representations by the lessor's agent was justifiable. *Id.* at 650. We concluded that Orca should have been alarmed by the "negation-of-warranty provision's direct contradiction of the representation upon which Orca claim[ed] to have relied." *Id.* at 658. This should have alarmed Orca, we explained, because "Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms." *Id.* (quoting *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424–25 (Tex. 2015) (per curiam)). Written agreements, relative to oral agreements, serve a purpose under the law to "provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute." *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

*Orca Assets* explained that, "[a] party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests," and therefore "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *See* 546 S.W.3d at 658 (citation omitted). Here, Barrow-Shaver argues that the farmout agreement does not contradict Carrizo's oral representations, while Carrizo contends that the agreement's unqualified consent-to-assign provision directly contradicts Laufer's oral representations. At first glance, the oral representations do not

44

seem to be directly contradicted by the consent-to-assign provision—Laufer represented that Carrizo would consent, and under the consent-to-assign provision, Carrizo was entitled to consent or not. A direct contradiction would be immediately apparent if, for example, Laufer had represented to Bertram, "Even if Carrizo doesn't consent, Barrow-Shaver can still assign its rights; this is all just a formality." In that case, the contract on its face would be directly contrary to the oral representation. While no such conflict is immediately apparent here, a deeper analysis as to the meaning of the consent provision reveals a direct contradiction. *See id.* at 658–60 (ascertaining the meaning of the contract to determine whether there was a direct contradiction).

In *Orca Assets*, we articulated a standard for determining whether a direct contradiction exists such that reliance on the oral representation is unjustifiable as a matter of law. *See id.* at 658. A contract sufficiently contradicts a representation if the meaning of contract "conflict[s] with the earlier representation such that a reasonable person could not read the agreement and still plausibly claim to believe the earlier representation." *Id.* (citation omitted). We rejected the court of appeals' application of a direct-contradiction standard that "both the contractual clause and the extra-contractual representation it supposedly contradicts must explicitly speak to the same subject matter with sufficient specificity to correct and contradict the prior oral representation." *Id.* at 659. We held that "[s]uch a requirement is simply too strict to be workable as it essentially requires the contract and extra-contractual representation to use precisely the same terms" and that a direct contradiction may occur "even when the terminology appearing in the representation and the writing are not exactly the same." *Id.* (citing with approval *Mikob Props., Inc. v. Joachim*, 468 S.W.3d 587,

45

599 (Tex. App.—Dallas 2015, pet. denied); *Playboy Enters. Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 256–57 (Tex. App.—Corpus Christi–Edinburg 2006, pet denied)).

*Orca Assets* involved a representation that the acreage was "open," which we determined was "essentially equivalent to stating [that] the trust had not leased the property and, thus, had good title." 546 S.W.3d at 659. We concluded that the agreement's negation-of-warranty clause directly contradicted the "essential equivalent of the representation"—that the trust had title—because this would require Orca to ignore the meaning of the negation-of-warranty clause. *Id.* at 659–60. It did not matter that the contract did not include the terms "leased," "open," or "unleased"—"it didn't need to" because the representation "amounted to" a guarantee of title and the contract provision did the opposite. *Id.* at 660. Thus, in determining whether there was a direct contradiction, we did not look just to the text of the contract clause, but we analyzed what such clauses are designed to do and the meaning of such a clause—looking beyond the text of the contract itself. *See id.* at 659–60.

Here, Carrizo's oral representations amount to: Carrizo will not stand in the way of Barrow-Shaver assigning its rights under the farmout agreement; rather, Barrow-Shaver will be able to assign whenever it desires and to whomever it desires. Based on the unambiguous language that gives Carrizo an unqualified right to withhold consent, as discussed above, a reasonable person would conclude that the contract means Carrizo holds the power through non-consent to prevent Barrow-Shaver from assigning its rights in the farmout. Comparing directly, the contract gives Carrizo the right to prevent an assignment, so Barrow-Shaver cannot assign whenever it wants; but if Laufer's oral representations are to be believed, Carrizo would not prevent an assignment and Barrow-Shaver could assign whenever it wants. In other words, under the contract Carrizo holds

46

the keys to an assignment; under Laufer's representations, however, the keys are firmly in Barrow-Shaver's hands.

We conclude that the consent-to-assign provision directly contradicts Laufer's oral statements. Moreover, as the court of appeals recognized, Carrizo's statements related directly to the consent requirement, essentially eliminating it from the agreement and representing that Barrow-Shaver alone held the power to assign—a direct contradiction to Barrow-Shaver only being able to assign with Carrizo's express approval. *See* 516 S.W.3d at 98. Therefore, a reasonable person could believe the oral representations in light of the consent-to-assign provision's unambiguous language. Barrow-Shaver is a sophisticated oil and gas company that negotiated the farmout agreement's terms at arm's length with a full understanding of the consent-to-assign provision's implications. *Cf. Orca Assets*, 546 S.W.3d at 660 (acknowledging that Orca had "sophisticated oil-and-gas business people" who "understood the implications of the language" in their agreement, and who "negotiated the . . . terms at arm's length"); *see also Grant Thornton LLP*, 314 S.W.3d at 923 (stating that "[i]n measuring justifiability, we must inquire whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud, it is extremely unlikely that there is actual reliance on the plaintiff's part'" (footnote & citations omitted)). And the consent-to-assign provision was specifically negotiated through a back-and-forth process. *See Orca Assets*, 546 S.W.3d at 654 (recognizing that "reliance on a representation made in a business or commercial transaction can be unjustified as a matter of law" (citation omitted)); *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 232 (Tex. App.—Dallas 2012, no pet.) ("Generally, reliance on representations made in a business or

commercial transaction is not justified when the representation takes place in an adversarial context." (citations omitted)). Barrow-Shaver, therefore, could not reasonably rely on Laufer's oral representations contrary to the provision under which Carrizo could prevent an assignment through non-consent.

Similarly, in *Playboy Enterprises, Inc. v. Editorial Caballero*, a case we cited with approval in *Orca Assets*, the court of appeals found a direct contradiction between the representation that renewal of a license agreement would be automatic and the contract, which stated that the licensee had the option to request renewal of the license. *Playboy Enters.*, 202 S.W.3d at 256–57; *see also Orca Assets*, 546 S.W.3d at 659. The court also found a direct contraction between a representation that a party could sell over 150,000 magazine copies per month and the contract language stating that distribution would not exceed 150,000 per month. *See Playboy Enters.*, 202 S.W.3d at 257–58. The court in that case found these to be contradictions although the representations and the contract did not use precisely the same terms. *See id.*; *see also Orca Assets*, 546 S.W.3d at 659 (explaining that although the oral representations did not use precisely the same terms as the contract, "[f]or Orca to rely on [the representation], it would have to ignore an express contractual provision explaining [otherwise]"). Likewise, in *Mikob Properties, Inc. v. Joachim*, which we also cited with approval in *Orca Assets*, the court of appeals held that an agreement containing a specific list of the parties covered under a settlement agreement directly contradicted a representation that the settlement agreement covered all parties, some of whom were not listed in the agreement. *See Joachim*, 468 S.W.3d at 599; *see also Orca Assets*, 546 S.W.3d at 659.

In this case, we recognize that Laufer's oral representations and the consent-to-assign provision also do not involve precisely the same language—that is, Barrow-Shaver may not assign without Carrizo's express written consent, and Carrizo will work with Barrow-Shaver and will give its consent. If we were to understand the two not to conflict, we would in effect read the consent-to-assign provision out of the parties' agreement, and we would be ignoring its meaning—the very question before this Court.[12] Indeed, if Carrizo would consent to any assignment at any time to any entity, then the specifically negotiated consent-to-assign provision would be useless. "A party who enters into a written contract while relying on a contrary oral agreement does so at its peril." *Orca Assets*, 546 S.W.3d at 658 (alteration omitted) (quoting *DRC Parts & Accessories*, 112 S.W.3d at 858–59). Looking to the meaning and effect of the consent-to-assign provision, we conclude that it directly contradicts Laufer's oral representations. *See also, e.g.*, *Carto Props., LLC v. Briar Capital, L.P.*, No. 01-15-01114-CV, 2018 WL 827558, at *10 (Tex. App.—Houston [1st Dist.] Feb. 13, 2018) (mem. op.) (holding that the complained-of representations that the defendant would waive enforcement of its rights under the contract was directly contradicted by the express, unambiguous terms of the contract, and therefore reliance on such representations was unjustifiable as a matter of law).

Moreover, we explained in *Orca Assets* that justifiable reliance can also be negated as a matter of law when there are "red flags" that indicate reliance is unwarranted. *See* 546 S.W. 3d at

---

[12] JUSTICE BOYD seems to say that Laufer's oral representations cannot conflict with the farmout agreement because the agreement is silent as to when Carrizo must consent or may withhold consent. *See post* at ___. But the absence of qualifying terms, and the lack of any language as to withholding consent, is the premise of the question before this Court, not the answer. As *Orca Assets* made clear, we must construe the parties' agreement and look to its meaning in determining whether the contract directly contradicts Carrizo's oral representations. *See Orca Assets*, 546 S.W.3d at 659.

655 (citing *Grant Thornton LLP*, 341 S.W.3d at 923). Although we hold that the direct contradiction negates justifiable reliance in this case, we address red flags as well because, as in *Orca Assets*, "both theories apply" and "either would be sufficient to preclude justifiable reliance." *See id.* at 660 n.2.

Carrizo argues that there were ample red flags alerting Barrow-Shaver that it could not justifiably rely on Laufer's representations. In *Orca Assets*, we reviewed the circumstances of the agreement's formation in their entirety—accounting for the parties' relative levels of sophistication, and recognizing that a party must exercise reasonable diligence and ordinary care to protect its interests and must be aware of all the facts that would have been discovered by a similarly situated and reasonably prudent person—to determine whether red flags make reliance unjustified. *See id.* at 657–58. Without even having to reach the parties' substantive negotiations, we point out the following red flags: (1) the farmout agreement imposed an unambiguous obligation on Barrow-Shaver and imposed no obligation on Carrizo; (2) the oral representations contradicted the clear and unambiguous consent provision; (3) both Barrow-Shaver and Carrizo were sophisticated oil and gas companies, so Barrow-Shaver should have understood that the oral representations had no bearing on the contract's express language; (4) Barrow-Shaver's representative's extensive experience in the oil and gas industry—specifically, thirty-three years of experience; (5) the fact that negotiations took place at arm's length to create an agreement other than a form agreement; (6) the parties knew utilizing consent-to-assign provisions is a common industry practice; and (7) the substance of the representation was inherently unverifiable because it conveyed a vague intent for someone else to do something sometime in the future under some circumstances not yet known.

A similarly situated "savvy participant" would have recognized that Carrizo could change its mind, if Laufer's representations were binding at all, and would have weighed the risk of that happening before entering into the agreement. *See id.* at 654, 656–57 (noting that "savvy participants" to an arm's-length transaction should be expected to recognize red flags that others who are less experienced may not, and that when a party is "skeptical" or recognizes "substantial risk" it cannot blindly rely on the other party's representations). Instead, Barrow-Shaver chose to rely blindly on Carrizo's representations when the contract provision clearly entitled Carrizo to withhold its consent, thereby preventing an assignment. Here, Laufer's vague and general statements indicating that Carrizo would give its consent were merely Laufer's representations of Carrizo's future intentions, statements that were inherently unverifiable, which should have been a red flag to Barrow-Shaver not to accept them blindly. We conclude that there are sufficient red flags in the entirety of the circumstances surrounding the farmout agreement's formation to negate justifiable reliance on Carrizo's oral representations as a matter of law.

We hold that Barrow-Shaver could not have justifiably relied on any statement that purported to change the parties' agreement. Therefore, the court of appeals did not err in reversing the trial court's judgment as to Barrow-Shaver's fraud claim.

## IV. Conclusion

In construing the parties' farmout agreement, we hold that the contract imposed no consent obligation on Carrizo and that Carrizo's right to withhold consent is unqualified. We hold that evidence of the surrounding facts and circumstances concerning the consent-to-assign provision—including the substantive negotiations and prior drafts of the farmout agreement, as well as industry custom and usage—is inadmissible extrinsic evidence, which is not to be used to imply

51

an obligation into the agreement. We decline to read a reasonableness standard—or impose any obligation not already in the contract—into the parties' bargained-for consent-to-assign provision. Therefore, we hold that Carrizo's denial of consent to Barrow-Shaver's proposed assignment could not have breached the parties' contract as a matter of law. Finally, we conclude that Barrow-Shaver could not justifiably rely on Carrizo's misrepresentations concerning an unambiguous provision. Therefore, we hold that, as a matter of law, Barrow-Shaver's fraud claim fails. Accordingly, we affirm the court of appeals, but on different grounds.

_____
Paul W. Green
Justice

OPINION DELIVERED:  June 28, 2019